### 18559

P. W. EASTERLIN, as Administrator of the Estate of Rhoderick D. Easterlin, Respondent, v. Johnny W. GREEN, and J. L. Crimminger, Trading and doing business as Crimminger Choice Cars, Appellants.

(150 S. E. (2d) 473)

*Messrs. Moore, Mouzon & McGee,* of Charleston, *for Appellants,*

*Messrs. J. D. Parler* and *Thomas O. Berry, Jr.,* of St. George, *for Respondent,*

September 7, 1966.

BRAILSFORD, Justice.

This wrongful death action arises out of an automobile accident. The defendants appeal from a judgment for plaintiff for $20,000.00 actual damages. Two issues are presented.

1. Should a verdict have been directed for the defendants upon the ground that plaintiff's intestate was guilty of contributory negligence as a matter of law?

2. Should a verdict have been directed for the defendant Crimminger for lack of evidence that the defendant Green was in the scope and course of his employment when the accident occurred?

In April, 1964, the defendant Crimminger was a used car dealer in Summerville and the defendant Green was his only employee. Green worked on the used car lot during the day and he customarily sold cars for his employer at night. He had a restricted driver's license, by which his right to drive was limited to his employer's vehicles for business purposes.

At closing time on Friday, April 24th, Green took one of Crimminger's automobiles, with the latter's knowledge and consent, and drove it to his home in Ridgeville, intending to "prospect" that night—"to see how many sales (he) could make." The automobile displayed a dealer's tag. Green was a successful salesman, and had broad discretion in carrying on this activity. He was allowed to moonlight without restrictions as to hours or territory. However, he was instructed not to go to Walterboro, where he liked to visit a friend.

At about 3:00 A. M., April 25, while Green was driving his employer's automobile in a northerly direction on a secondary highway toward Ridgeville, he rounded a curve, drove across the center line into the lane for southbound traffic, and ran over Rhoderick D. Easterlin, plaintiff's intestate. Green drove to the used car lot in Summerville and notified Crimminger, who, in turn, notified Sheriff Knight, and the three of them returned to the scene within a short time.

Sheriff Knight testified that the night was dark and there was some fog. He found Easterlin's body in the southbound lane of the highway. Tire marks, which terminated at the body, commenced on a curve one hundred eighty feet south of it. These marks and articles of clothing, bits of fabric and splotches of blood, extending to a point ninety

feet south of the body, were all in the lane for southbound traffic.

Green stated to Sheriff Knight that after calling on two prospective purchasers in Summerville, he had driven to Walterboro to see a friend. He left Walterboro about 2:30 A. M. Quoting from the Sheriff's testimony, "when he crossed Edisto River back into Dorchester County on Highway 61 * * * *he turned to the right* and went to the home of one Nick Green to talk to Nick Green's son (who was not at home) * * * he left Nick Green's house, *coming back out to Highway 61,* driving just below and turning left on Highway S-18-30; he stated to me that he was driving the car approximately fifty-nine miles an hour when he approached the curve; he saw an object but he didn't know what it was, in the highway and that he had run over the object in the highway." (Emphasis ours.)

On cross examination, the Sheriff testified that the skid marks indicated that the right wheels were approximately on the center line, the other wheels in the southbound lane. The only damage to the car was a dent in the license plate which was attached to the center of the front bumper.

Green testifed that he left Walterboro about 2:15 A. M. and was on his way to his home in Ridgeville when the accident occurred. It was a dark night with some fog. He was driving at fifty to fifty-five miles per hour and reduced his speed to about forty-five on a curve. As he rounded the curve, he saw an object about three hundred feet ahead lying in the center of the road, parallel to the center line, which he took to be a pasteboard box that had been run over and crushed by another car. He made no effort to stop,[1] or to avoid striking the object. Instead, he decided to straddle it. As he did so, he heard a bumping noise under the car and

---

[1] The witness' testimony on this point was not consistent, but this is the most reasonable inference from it, particularly the following passage: "Q. * * * you saw an object three hundred feet ahead of you in the road and it didn't occur to you that you should stop, * * *. A. I slowed down. I slowed down to forty-five. Q. You slowed down to about forty-five? A. That is correct. Q. And then you went right on over the object? A. That is correct."

stopped. He backed the automobile until the headlights shone on Easterlin's body. He went to the body and touched it, "he felt cold." [2] Green then returned to the automobile and drove to Summerville. Green denied having told Sheriff Knight that after returning to Dorchester County from Walterboro he made a call at the home of Nick Green.

There were no eyewitnesses to the accident except Green. However, shortly before it occurred, Easterlin and several other men, including Prentiss and Eugene Davidson, were at a nearby "camp" where beer and fish stew were sold. Prentiss and Easterlin left the camp together and walked to the secondary highway in question. Easterlin crossed the highway and headed south toward his home, walking on the right. Prentiss headed north toward his home, some quarter of a mile away. Prentiss testified that he had seen Easterlin drink some beer at the "camp", but that he appeared to be sober and in good physical condition. He walked "straight" and in a normal manner. Prentiss walked directly to his home after he and Easterlin separated. As he entered his yard, he heard the "squall of some brakes" from the south. Upon investigation the next morning, he learned that the site of the accident was approximately the same distance south of the point where he and Easterlin had separated as his own home was north of it.

Eugene Davidson also testified that Easterlin was apparently sober and in good physical condition when he left the camp with Prentiss. On the other hand, an expert who examined a blood sample taken from the body testified that the alcoholic content was 171 milligrams per cent and that a person with this amount of alcohol in his bloodstream is drunk.

> In passing upon the issues presented, we must view the evidence and the inferences to be drawn therefrom in the light most favorable to plaintiff and have

---

[2] This testimony was offered in support of an allegation of the answer that Easterlin was already dead when Green drove over his body.

made no attempt to state all of the evidence tending to favor the defendants' contentions.

*As to contributory negligence.*

The answer of the defendant Green charges that Easterlin was contributorily negligent "in that the said Rhoderick D. Easterlin, while in an intoxicated condition, lay down upon the paved surface of a public highway in the path of vehicles lawfully using the said highway, thereby placing himself in a position of known and obvious peril." The plea in the answer of the defendant Crimminger is of the same tenor. The motion for a directed verdict with respect to this defense was "that all of the testimony now indicates that even if Green was negligent in the operation of his automobile, the negligence of the plaintiff in apparently passing out in the middle of the road was at the very least contributory negligence. * * *" However, the brief does not argue that the only reasonable inference from the evidence is that Easterlin while intoxicated lay down or passed out on the roadway.[8] This is referred to as the defendants' version of the accident and it is argued that even if plaintiff's version be accepted, and it be inferred that Easterlin was walking in the southbound lane when struck by the northbound car, he was in violation of Section 46-436, Code of 1962, which requires a pedestrian, when practicable, to walk only on the left side of the roadway or its shoulder, facing traffic which may approach from the opposite direction. It is probably a sufficient answer to point out that Easterlin's failure to observe the statute in this respect was not a ground of the plea of contributory negligence, nor a ground of the motion for a directed verdict. Therefore, it is not available here as a ground for reversal of the judgment below. *Mize v. Blue Ridge Ry. Co.*, 219 S. C. 119, 64 S. E. (2d) 253. However, a verdict for the defendants by direction could not soundly have been rested upon the theory that Easterlin was contributorily negligent in violating the statute. Its obvious pur-

---

[8] There has been no reliance by plaintiff upon the doctrine of last clear chance.

pose is to put pedestrians out of the way of traffic lawfully approaching on the right of the roadway from behind them. The requirement that a pedestrian walk on his left side has no tendency to protect him from oncoming traffic. The direction in which Easterlin was walking was purely coincidental insofar as the hazard which overtook him is concerned. His chance of escape when the northbound automobile made an unlawful turn into the southbound lane would have been even less if he had been headed north, and thus walking on his left side of the roadway in compliance with the statute. His violation of the statute was a mere condition of the occurrence, and not its proximate cause. See *Young v. City of Camden,* 187 S. C. 414, 198 S. E. 45; *Myers v. Evans,* 225 S. C. 80, 81 S. E. (2d) 32.

Nor do we think that the court erred in overruling the ground of the motion which was relied upon at the trial. The defense of contributory negligence is an affirmative defense and the burden was upon the defendants to establish it by the greater weight or preponderance of the evidence. The jurors were not bound to believe Green's rather unconvincing testimony, which to some extent was inconsistent with physical facts and the testimony of other witnesses. They could, with reason, have concluded that it was largely a fabrication. The expert's testimony that the alcoholic content of the blood sample would make a person drunk was not conclusive. The word "drunk" is a relative term which does not suggest an exact degree of intoxication. It was for the jury to weigh and evaluate this testimony with the other evidence bearing on the issue. We cannot say that the only reasonable inference from the evidence is that the defendants met their burden of proof with respect to this affirmative defense.

*As to Green being within scope of employment.*

It is inferable from the evidence that an important part of Green's activity in behalf of his employer took place at night. It is reasonable to infer that he was expected to travel about in his employer's automobile, within reasonable bounds, to

seek out frequented places, mingle with people, and call on friends and acquaintances. His contacts were important to his success as a used car salesman. It was natural for his activity to combine business and pleasure and for the dividing line to be sometimes obscure.

When the injury was inflicted, the acknowledged servant was driving his master's automobile. He was within the area of his employment as to both place and time, and was engaged in an activity which was normally incident to it. We think that these circumstances were clearly sufficient to make out a *prima facie* case that Green was acting within the scope and course of his employment. 8 Am. Jur. (2d), Automobiles and Highway Traffic, Section 912. The court did not err in refusing to hold, as a matter of law, that this showing was overcome by defendants' evidence. The defendants' sole reliance is upon the view that Green's deviation from his employment by driving to Walterboro put him outside of the scope of it when the accident occurred sometime later. At best, a jury question was presented. If we accept Green's uncorroborated testimony, although, presumably, supporting testimony was available, at its face value, which the jury was not bound to do, the issue of whether he had returned to the scope of his employment remains. The italicized words in the quotation from Sheriff Knight's testimony, *supra,* tend to establish that after leaving Walterboro and entering Dorchester County, Green turned aside from his route in order to make a call on a friend or acquaintance, which his commission from Crimminger clearly authorized, whether or not the person whom he sought to locate was a prospective customer. Green lived at Ridgeville, some fifteen miles from the used car lot. It was necessary or desirable in carrying out his mission for Crimminger that he be permitted to keep the cars entrusted to him overnight. It is reasonably inferable from the evidence that when the injury was inflicted, Green was traveling toward his home in Ridgeville from the point in Dorchester County at which he had make his last call, and that this journey was both authorized by Crimminger and within the scope of

398

Green's employment. The controlling principles were well stated for this court in *Adams v. South Carolina Power Co.,* 200 S. C. 438, 21 S. E. (2d) 17. See the interesting opinion in *Cochran v. Michaels,* 110 W. Va. 127, 157 S. E. 173, which involved an automobile salesman with a "roving commission." See also the following annotations: 51 A. L. R. (2d) 8, "Deviation from employment in use of employer's car during regular hours of work"; 53 A. L. R. (2d) 631, "Liability of employer for negligent operation of motor vehicle by automobile salesman."

Affirmed.

Moss, C. J., Lewis and Bussey, JJ., and Lionel K. Legge, Acting Associate Justice, concur.

