Parsons v. Malpass                    CV-98-102-JD   03/19/99

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Gardner W. Parsons, Jr., et al.

    v.                                Civil No. 98-102-JD

Charles U. Malpass, et al.


O R D E R


    The plaintiffs, Gardner Parsons, Jr., and his wife, Mary
Parsons, brought this personal injury action against the
defendants, Charles Malpass, Vernon Malpass, and Second Hand Rose
Vehicle ("Second Hand Rose"), asserting claims of negligence and
loss of consortium.  Before the court is the motion of defendants
Vernon Malpass and Second Hand Rose seeking dismissal of counts
three through ten (document no. 15).


Background[1]

    On November 28, 1997, Gardner Parsons was operating a motor
vehicle owned by his wife, Mary, on Route 1 in North Hampton, New
Hampshire.  Charles was operating a 1995 Mercedes wagon purchased

_____

    [1]The motion to dismiss before the court addresses claims
against defendants Vernon Malpass and Second Hand Rose Vehicle
predicated upon the their liability for the actions of Charles
Malpass.  The background section therefore discusses at length
the relationship between the parties.  To avoid confusion the
court hereinafter refers to the Malpasses by their first names.

by his wife, Ann, on Hobbs Road and was turning onto Route 1 when his automobile collided with the Parsons' automobile.[2]

The automobile that Charles was operating at the time of the accident bore Second Hand Rose dealership plates. Vernon owns Second Hand Rose Vehicle, an unincorporated used car dealership located in Delaware. He began the enterprise in July, 1996, in part with funds loaned to him by Ann. The loan is outstanding, not evidenced by any notes, and is interest free. Evidence indicates that repayment is expected, although unscheduled.

Charles had just dropped off Jay Megan, a family friend, at Megan's home, and was on his way either to a liquor store to pick up some champagne for an engagement party or to his home.[3] Megan had purchased an automobile from Ann some months prior to the accident. Charles facilitated this but did not receive any compensation for his actions.

Although the automobile Charles was driving was purchased by Charles's wife in April 1997, it was not registered in any state. Charles testified that he had delayed registering the car because

---

[2]The record is inconsistent as to whether Ann actually purchased the car herself or whether she had the car purchased for her by Charles. In any event the Retail Certificate of Sale identifies her as the purchaser of the automobile and her status as purchaser is corroborated by testimony in the record.

[3]The record contains conflicting evidence on Charles's destination.

it had mechanical problems.[4]  After failed attempts to repair it,
Charles contacted his brother and inquired whether Vernon might
be able to sell the vehicle if Charles and Ann were unsatisfied
with it.  The record indicates that at the time of the accident
Charles and Ann were still unsure whether they would keep the
vehicle, although they were preparing to bring the vehicle to
Delaware to sell it through Second Hand Rose should they decide
not to keep it.  Vernon indicated that he would be willing to try
to sell the vehicle and that he might have success as his store
is on a busy highway, but that it might prove difficult to sell a
1995 Mercedes as he generally sells older cars.  In any event,
neither Vernon nor Second Hand Rose would earn a profit from the
transaction.

Both Charles and Vernon state that Charles was not an
employee or partner of Second Hand Rose.  However, on occasion he
assisted Vernon with financial accounts, helping Vernon set up
financial books when Second Hand Rose initially opened.  On five
or six dates, when Charles was living in New Hampshire and
visited Vernon in Delaware, if Vernon did not have time to spend
at home with Charles, Charles would drop by Second Hand Rose and

---

[4]There is evidence that at one point Charles had attempted
to register the car in Maryland but was unsuccessful as the
application was not completed in full.

assist him by updating some automobile accounts and by driving Vernon to acquire vehicles for Second Hand Roses's inventories.[5] In addition, he gave Vernon advice on filling out titles for automobiles. He was never paid for his services and Vernon characterized the assistance as a favor to a brother.

Charles was also given power of attorney to purchase automobiles for Second Hand Rose if he should come across a favorable deal. Vernon and Charles had an agreement whereby Charles would "keep an eye out" for good automobile deals. If Charles found one and purchased the automobile, Vernon agreed to reimburse him, although Charles understood that confirmation with Vernon was necessary.[6] To this end, Vernon sent him books on automobile values. There was never any written or formal agreement between Vernon and Charles regarding this arrangement besides the power of attorney, which is not in the record.

---

[5]Charles was listed on Second Hand Rose's insurance policy as an "owner, employee, or relative who will operate owned autos," Pls.' Opp., Ex. O at 4. Elsewhere in the policy Vernon states that Second Hand Rose had one full time employee and one part time employee, although it does not identify the part time employee. Vernon denies having any employees beyond himself, although the record indicates he received help from friends who would assist him in repairing automobiles, all for no compensation. Neither Vernon nor Second Hand Rose has ever filed any tax or benefits documents for any alleged employees.

[6]Charles characterized himself as an authorized representative of Second Hand Rose in his statement to an insurance company, Pls.' Opp., Ex. M at 1, and he signed his name as such, Pls.' Ex. I at 4.

4

The record indicates that Charles did not make any purchases for Vernon or Second Hand Rose, with one possible exception. At one point in time Charles called Vernon, asked him if he could sell a Chevrolet Caprice station wagon, and when Vernon stated that he could, Charles and his son drove it to Wilmington, Delaware, and left it for Vernon at the Wilmington airport. The record is ambiguous as to the origin of the automobile because Vernon could not recall with absolute certainty whether it was an automobile already owned by the family or not, although he believed it was. Nor could Vernon recall whether there were dealer plates on the automobile. It is therefore unclear whether Charles purchased the Caprice.

Second Hand Rose had been issued six dealer plates by the State of Delaware. Vernon did not have a use for six dealer plates and therefore permitted Charles to use them if he needed them. He anticipated that they would be used to acquire vehicles for Second Hand Rose. When Charles came to Delaware he would occasionally take a dealer plate. Vernon never requested that the plates be returned and never requested that he be notified if Charles used the plates. Vernon never refused to give Charles permission to use the plates.

Charles had one or two in his possession at the time of the

5

accident, including the plate on the car involved in accident. Charles had a history of using the dealer plates on various automobiles, including another Mercedes station wagon owned by his wife and a Mercedes coupe. Although Vernon authorized Charles to use the plates, Vernon was generally unaware of Charles's use of the plates, and was unaware that the plates were on the car at the time of the accident.

On February 25, 1998, the plaintiffs filed this action asserting ten counts. Counts one and two, not contested here, assert that defendant Charles is liable for negligence in the accident and resulting loss of consortium. Counts three through ten assert the liability of Vernon individually, Second Hand Rose, Vernon Malpass d/b/a Second Hand Rose, and Vernon Malpass and Charles Malpass, d/b/a Second Hand Rose, for Charles's alleged negligence and resulting loss of consortium. Defendants Vernon and Second Hand Rose move to dismiss the claims against them, asserting a lack of agency or employment relationship and contesting whether the trip at issue was within the scope of such a relationship.

<u>Discussion</u>

A. <u>Standard of Review</u>

Although the defendants move to dismiss counts three through

6

ten of the complaint without specifying in their motion the Federal Rule of Civil Procedure pursuant to which they move, in their reply to the plaintiffs' objection the defendants characterize their motion as a Rule 12(b)(6) motion.  However, the defendants have attached numerous exhibits and their motion is premised upon the evidence in the record, repeatedly citing to depositions or interrogatories.

"Rule 12(b) provides that a court shall convert a motion to dismiss for failure to state a claim into one for summary judgment if 'matters outside the pleadings are presented to and not excluded by the court.'" C.B. Trucking, Inc. v. Waste Management, Inc., 137 F.3d 41, 43 (1st Cir. 1998) (quoting Fed. R. Civ. P. 12(b)(6)).  The First Circuit "employ[s] a functional approach to the conversion process."  Id.  "Accordingly, [it] has not required a district court to give express notice of its intention to convert if the surrounding circumstances effectively place the parties on notice that the court has the option of treating the motion as a motion for summary judgment and the parties have been given 'reasonable opportunity to present all material made pertinent to such a motion by Rule 56.'"  Id. (quoting Rodriguez v. Fullerton Tires Corp., 115 F.3d 81, 83 (1st Cir. 1997)).

Under the circumstances of this case the court will convert

7

the defendants' motion to one for summary judgment. They have supplied additional documentary materials, their arguments are replete with citation to exhibits and are premised upon evidence therein, and they have been allowed the opportunity to file additional reply memoranda. Moreover, the plaintiffs' objection expressly identified the issue of conversion for the defendants and notified them that their motion had to be treated as one for summary judgment because of the defendants' inclusion of supporting evidentiary materials. Indeed, the defendants' notice of the likelihood of conversion is indicated by their reply to the plaintiffs' opposition where they stated "[e]ven if the court treats this motion as one for summary judgment, the Plaintiffs, in responding to a motion for summary judgment, have the burden of setting forth specific facts demonstrating that there is a genuine issue for trial." Reply at 3.

The role of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Snow v. Harnischfeger Corp., 12 F.3d 1154, 1157 (1st Cir. 1993) (quoting Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992)). The court may only grant a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

8

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The parties seeking summary judgment bear the initial burden of establishing the lack of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992). The court must view the entire record in the light most favorable to the plaintiffs, "'indulging all reasonable inferences in [their] favor.'" Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)). However, once the defendants have submitted a properly supported motion for summary judgment, the plaintiffs "may not rest upon mere allegation or denials of [their] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)).

The defendants have premised their motion on their contention that: (1) Charles was neither an agent nor an employee of Vernon, nor of Second Hand Rose; and (2) even if he was an agent or employee, he was not acting within the scope of his agency or employment relationship at the time of the accident. In their objection, the plaintiffs assert four grounds

9

upon which Charles can allegedly be found to be an agent of Vernon and/or Second Hand Rose. They contend that there are genuine issues of material fact as to whether Charles was a partner, joint venturer, employee or general agent of Vernon and/or Second Hand Rose. They further contend that genuine issues of material fact exist as to whether Charles was acting within the scope of the agency or employment relationship at the time of the accident.

In addressing the parties' arguments, the court first resolves the issue of whether there is a genuine issue of material fact regarding the existence of an agency relationship, be it in the form of a partnership, a joint venture, an employment relationship, or a general agency relationship. The court considers the arguments seriatim. See infra, sections B, C, and D. The court then addresses the issue of whether Charles was acting within the scope of such an agency relationship at the time of the accident. See infra, section E.

As a preliminary issue, however, the court notes that the parties fail to address the issue of what law, New Hampshire or Delaware, they believe controls particular aspects of the case. Although at times the parties cite New Hampshire and Delaware law, without specifying which governs the issue presented, the parties generally rely upon New Hampshire law. The court

10

accordingly applies New Hampshire law unless otherwise noted.

B.    Partnership and Joint Venture

The plaintiffs argue that Second Hand Rose and Vernon can be held liable based upon the alleged existence of a partnership or a joint venture between Vernon and Charles and the agency relationship resulting therefrom.  The defendants fail to contest Charles's status as a partner of Vernon's in Second Hand Rose or as a joint venturer with Vernon, and supply no law or analysis on the issue beyond their general agency and employee arguments.[7]

It is the burden of the movant to identify for the court those issues upon which there are no genuine issues of material fact and to demonstrate that they are entitled to summary judgment.  See Celotex Corp., 477 U.S. at 323.  The court therefore does not reach the issue of whether the record could reasonably support an inference that Charles was a partner in Second Hand Rose or involved in a joint venture to sell the automobile.  For the purposes of this order the court assumes that such agency relationships existed.  Liability may flow therefrom if Charles could reasonably be found to have been

_____

[7]Nor do the defendants raise any objection as to the breadth of the complaint and its ability to encompass allegations of a joint venture.

11

acting within the scope of such an agency relationship at the time of the accident as discussed further in section E.

C.   Employment

In Boissonnault v. Bristol Federated Church, 138 N.H. 476, 477-78 (1994) the New Hampshire Supreme Court discussed the elements of an employment relationship under New Hampshire law. New Hampshire has adopted "what is now referred to as the totality of the circumstances test, requiring consideration of many factors, including the criteria set forth in Restatement (Second) of Agency § 220 (1958)." Id. (quotations and citations omitted). The Restatement identifies as relevant factors, among other things:  (1) the control exerted over the performance of the services; (2) whether it is a distinct occupation or business; (3) whether in the occupation the work is performed under direct supervision or by a specialist; (4) the skill required; (5) the instrumentalities provided; (6) the length of time the person is employed for; (7) payment; and (8) whether the parties believe they are forming a master servant relationship. Restatement (Second) of Agency, § 220 (1958).

Control, although no longer given the dispositive weight courts once attributed to it, is still a factor central to the determination of an employment relationship.  In the case at hand

the record indicates that Vernon exercised very little control over Charles. He had given Charles power of attorney and authorized him to purchase automobiles for Second Hand Rose. However, as is evident from Vernon's deposition, the authorization was extremely informal:

> I was just getting going, you know. I was trying to entertain something of maybe getting automobiles from up here that aren't available down there. I said look, you see older cars that you think I could use, buy them for me. I will reimburse you or whatever. Call me. I'll send you the money or whatever . . . .

Vernon Dep. at 78-79. Broad discretion was obviously conferred. The record does not indicate that Vernon could direct Charles to actively look for and acquire automobiles, or that he could tell him how to look for automobiles. Indeed the evidence indicates that the only control Vernon had over Charles was the power to tell him not to purchase an automobile, as Charles testified at his deposition that he had to obtain Vernon's approval before using the power of attorney. See Charles Dep. Vol. II at 94. Nor did Vernon supervise Charles's actions or lack thereof.

Charles's work on behalf of Second Hand Rose was sporadic at best. He assisted Vernon when Second Hand Rose was first opened and on occasions when he visited Vernon and Vernon did not have leisure time to spend with him. Other than perhaps securing the Caprice, the circumstances of which are ambiguous, the record

13

indicates that over Second Hand Rose's existence up to the date of the accident Charles never exercised his authorization to purchase automobiles for Second Hand Rose.[8]

The record indicates that the parties certainly did not consider Charles an employee of Second Hand Rose.  See Vernon Interrogatories at 7, 8, 9.  This is corroborated by the lack of evidence that Charles was paid, received wages, or was otherwise compensated for any labor he offered Vernon, and the lack of control Vernon exercised over Charles.[9]

Nor does the record indicate that Vernon supplied Charles with instruments necessary to secure automobiles such as would support finding an employer/employee relationship.  He did not provide Charles with funds to purchase the automobiles.  There is no evidence that Vernon provided Charles with gas mileage or lists of auctions or other such places to look for automobiles.

---

[8]The court also notes that Charles's labor valuing automobiles and their potential for resale and updating financial accounts is not unskilled labor such as would indicate an employment relationship.  See Restatement (Second) of Agency, § 220 comment h.

[9]Given, inter alia, the facts of this case and Second Hand Rose's tendency to have various people stop by and assist Vernon, and the lack of any other documentation such as tax documents which could indicate employment, the statement on Second Hand Rose's insurance application that it had a part time employee does not, without more, create a genuine issue of material fact that Second Hand Rose employed Charles on a part time basis.

14

Vernon did occasionally mail car value booklets to Charles but this, even considering Charles's power of attorney and his listing as an occasional driver on the Second Hand Rose insurance policy, hardly supplied Charles with the instrumentalities to look for and purchase cars for Second Hand Rose or Vernon.

Regarding the potential instrumentality of the car, the plaintiffs contend that there is a genuine issue of material fact surrounding the ownership of the automobile involved in the accident, and that this has bearing on whether an employment relationship existed and whether Charles was acting within the scope of it when the accident occurred. They rely upon evidence that: (1) the automobile was unregistered with an open title at the time of the accident; (2) the car bore Second Hand Rose dealership plates; and (3) Vernon's automobile insurance application for Second Hand Rose lists his brother, Charles, as an owner, employee, or relative who could operate owned autos.

While the vehicle was unregistered with an open title at the time of the accident, the Retail Certificate of Sale lists Ann as the purchaser of the vehicle. There is no evidence nor allegation that Ann was a partner, joint venturer or agent of any kind of Vernon or Second Hand Rose. Vernon testified that the car was purchased for Ann, and Charles testified that Ann was the owner of the vehicle. Vernon stated that although he was asked

15

if he might be able to sell it as an eventuality if Charles and Ann chose not to keep it, neither he nor Second Hand Rose were the intended recipients of the automobile.  Charles testified similarly.

Morever, the circumstances of this case undermine the import of Charles's use of the Second Hand Rose plates.  Evidence in the record indicates that Charles used the plates on at least three family cars, including the car involved in the accident.  There is no evidence nor allegation that these cars were owned by, purchased for, sold through, or otherwise associated with Vernon or Second Hand Rose beyond the use of the plates.  Charles and Ann therefore had a history of purchasing cars and operating them with Second Hand Rose plates.  Indeed, on the date of Charles's deposition, Charles was using one of the plates on a white Mercedes wagon that belonged to his wife.[10]  Vernon also testified that Charles had the license plates, one or two at a time, on an ongoing basis.  Although Charles had standing permission to use the plates "on any car," and the permission was never refused, Vernon was unaware of the details of Charles's use

---

[10]Both of the first two cars that Charles used the plates on have since had their registrations expire and are now, therefore, unregistered as well.  The record contains conflicting evidence as to whether they are still driven, although Charles's use of one of the automobiles, with Second Hand Rose plates, for transportation to his deposition, suggests that they are.

16

of the plates.

Nor did Vernon know that the vehicle in the accident bore Second Hand Rose plates. He had never seen the car before, and had had only one conversation about the car with Charles before the accident. In that conversation Charles asked if Vernon could sell the car in the event he and Ann decided not to keep it. Nothing was said about the dealer plates:

> [Vernon]: I wasn't aware that he was using the plate. I didn't tell him not to. I don't know. I had no idea whether the car that he bought, that Mercedes wagon, had plates on it or not when he purchased it or not. I don't know. I didn't ask him are you using the dealer plate on that car. I didn't. I never asked him that.
>
> [Plaintiffs' Counsel]: I thought you told us before that he had permission to use the dealer plates on that car?
>
> A. He had permission to use the plate on any car. It was never specifically said can I use it on this car. He just – you know, we had been family a lot of years. My dad was a dealer before us, so forth, like it's an everyday thing.

Vernon Dep. at 87-88. Nor is there any evidence that Vernon or Second Hand Rose were ever requested to reimburse Charles for the purchase of the automobile, as their agreement required if Charles bought the car for his brother or Second Hand Rose.

The plaintiffs also argue that Delaware law supports a presumption that Second Hand Rose or Vernon were the owners of the automobile, relying on Finkbiner v. Mullins, 532 A.2d 609,

17

613 (Del. Super. Ct. 1987). However, they do not explain or support their reliance on Delaware law for this issue. In any event, any such presumption is thoroughly undermined by the facts of this case and the parties' historical use of the plates.[11]

The plaintiffs similarly rely on Delaware Code Annotated Title 21 section 2124(a) to establish ownership, which provides that a dealer owning any vehicle required to be registered may operate the vehicle on Delaware roads if the vehicle is used in the dealer's business, for the personal pleasure of the dealer or immediate family, or for testing or demonstrating such vehicles. See Del. Code Ann. tit. 21 § 2124(a) (1998). The plaintiffs' reliance on this statute is circular, however, as section 2124(a)'s relevance depends upon first establishing the dealer's ownership of the vehicle, and the plaintiffs seek to use the statute to establish that ownership.[12]

---

[11]They also assert that a presumption of behavior in accordance with the law supports the conclusion of ownership of Vernon and/or Second Hand Rose. Again, this is undermined by the record and by Vernon's testimony as to his understanding of the law.

[12]In the alternative, the plaintiffs rely upon New Hampshire statutory law which provides that a dealer may not lend out its New Hampshire dealer plates, but the plates at issue in this case are not New Hampshire dealership plates. See RSA § 261:108 (1993). The plaintiffs' reliance on RSA § 261:111 (Supp. 1998), governing New Hampshire dealers and vehicles registered under a New Hampshire dealer's registration is similarly flawed.

18

Finally, the plaintiffs rely on Grimes v. Labreck, 108 N.H. 26, 29 (1967) for precedent that mere purchase of a car does not establish ownership. However, the case is readily distinguishable. The purchaser testified that she had bought the car as a matter of convenience for her son. Her son was making payments on the car, the registration bore his initials, and he regularly drove the car and had beneficial use of it.

Here, the evidence indicates that the car was purchased by or for Ann. There is no indication that any of Vernon's or Second Hand Rose's funds were used to purchase or maintain the vehicle. Unlike the registration in Grimes bearing the son's initials, here, although the car is unregistered, there is no evidence indicating that Vernon or Second Hand Rose did own the vehicle beyond the use of the plates discussed above.

The court concludes on this record that the plaintiffs have failed to establish the existence of a genuine issue of material fact regarding the ownership of the automobile. Their reliance on it to establish an employment relationship or to advance issues relating to the scope of the relationship, addressed later in section E, therefore fails.

In sum, the court concludes that there is no genuine issue of material fact concerning whether Charles was an employee of Vernon or Second Hand Rose. Therefore, vicarious liability may

19

not be predicated upon such a relationship.

D.    Agency

In Carrier v. McLlarky, the New Hampshire Supreme Court discussed agency relationships under New Hampshire law. See 141 N.H. 738, 739 (1997). The issue is one of fact. See id. "An agency relationship is created when a principal gives authority to another to act on his or her behalf . . . and the agent consents to do so." Id. (citing Fleet Bank-N.H. v. Chain Constr. Corp., 138 N.H. 136, 139 (1993); 93 Clearing House, Inc. v. Khoury, 120 N.H. 346, 348-49 (1980)). "The granting of authority and consent to act need not be written, but 'may be implied from the parties' conduct or other evidence of intent.'" Id. (quoting 93 Clearing House, Inc., 120 N.H. at 349).

On the record before the court, a reasonable juror could find that an agency relationship existed between Vernon or Second Hand Rose and Charles. Vernon requested that Charles take note of any older cars that Second Hand Rose might be interested in. He gave him power of attorney to purchase such automobiles and promised to reimburse him for any expenditures he made. In return, the actions of Charles could support a reasonable inference that he consented to such an agency relationship. He accepted power of attorney, he represented to others that he was

20

an authorized representative of Second Hand Rose, he signed his name as an authorized representative of Second Hand Rose, and he accepted Second Hand Rose dealer plates which Vernon allowed him to take in the event he came across any automobiles of interest. In this case, vicarious liability may therefore be predicated upon a general agency relationship.

E.   Scope and Liability

As discussed above, the plaintiffs assert the liability of Vernon and Second Hand Rose on the theory of an agency relationship.  The plaintiffs argue that there are genuine issues of material fact regarding the existence of such an agency relationship in the form of a partnership, a joint venture, an employment relationship, or a general agency relationship.  The court concluded above that summary judgment is warranted only as to the existence of an employment relationship.  However, having addressed the issue of whether the record could reasonably support the existence of such agency relationships, the court must now address ramifications of each relationship as regards liability.  Again, the parties all rely upon New Hampshire law.

In Miami Subs Corp. v. Murray Family Trust, 142 N.H. 501 (1997), the New Hampshire Supreme Court addressed joint ventures and partnerships under New Hampshire law:

21

> A joint venture is an association of two or more persons formed to carry out a single business enterprise for profit. . . . [P]arties in a joint venture stand in the same relationship to each other as the partners in a partnership . . . and courts generally have applied the law of partnerships to joint ventures.

Id. at 508 (citations and quotations omitted). Therefore, the New Hampshire Supreme Court "look[s] to relevant law on joint ventures; general partnership law; and the Uniform Partnership Act (UPA), RSA chapter 304-A, to guide" it in addressing issues pertaining to joint ventures and partnerships. Id.

New Hampshire has followed the Uniform Partnership Act. See NH RSA § 304-A (1995). Section 304-A:9(I) provides that "[e]very partner is an agent of the partnership for the purpose of its business." Section 304-A:13 further provides that:

> Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his co-partners, loss or injury is caused to any person . . . the partnership is liable therefor to the same extent as the partner so acting or omitting to act.

Delaware law is identical for present purposes. See Del. Code Ann. tit. 6 §§ 1509, 1513 (1998). In this case, therefore, a partnership or joint venture could be the basis for liability if Charles was "acting in the ordinary course of the business of the partnership or with the authority of his co-partners . . . ." Id.

22

Similarly, a general agency relationship may be the basis for vicarious liability.  See Restatement (Second) of Agency, § 250, § 220 comment e; see also, Boucouvalas v. John Hancock Mut. Life Ins. Co., 90 N.H. 175 (1939).  Citing Boston v. B & M Super Serv., 91 N.H. 392, 396 (1941), the plaintiffs argue that "the fact that [an action] was in part, or even mostly, for purposes of social entertainment would not overcome the fact of some agency."  Id. (applying Maine law).[13]

Independent of the nature of the agency relationship, whether it be a partnership or a general agency relationship, the plaintiffs proffer only two grounds in support of their contention that Charles's trip at the time of the accident was within the scope of an agency relationship.  First, the plaintiffs assert that Charles had a "roving commission" to search for used cars for Vernon.  They contend that "[t]he bottom line is very simply that, every time Charles left his house, he was on the job for Second Hand Rose."  Pls.' Opp. at 21.  Second, they assert that on the particular trip in question the passenger in the vehicle was a potential purchaser of the automobile and that it was being shown to him for that purpose.

---

[13]The plaintiffs rely upon Boston v. B & M Super Service, 91 N.H. 392, and the defendants do not contest its consistency with New Hampshire law.

23

In support of their first theory, the plaintiffs point to the following evidence in the record: (1) Charles had ongoing instructions to look for used cars as he traveled; (2) Vernon gave Charles power of attorney and dealer plates; (3) Vernon sent Charles booklets containing used car values. The plaintiffs rely on two cases where liability was based on a theory of "roving commissions," Easterlin v. Green, 150 S.E. 2d 473 (S.C. 1966), and Cochran v. Michaels, 157 S.E. 173 (W.Va. 1931).

The evidence indicates that there was an open ended authorization to purchase automobiles for Second Hand Rose. However, with the exception of the ambiguous circumstances surrounding the Caprice, nothing in the record indicates that this was ever acted upon. Vernon states that Charles never purchased any cars for Second Hand Rose. Nor could Vernon remember whether Charles had ever used the power of attorney for Second Hand Rose. Given the evidence that at most one car was purchased for Second Hand Rose, a reasonable inference is that the booklets were rarely, if ever, used for Second Hand Rose's benefit either.

The plates had been used on at least three of Ann's and Charles's automobiles. There is no evidence that either of the first two cars were sold to Second Hand Rose or that they were purchased with Second Hand Rose or Vernon in mind. Evidence

24

indicates that the third car bearing dealer plates, the one involved in the accident in this case, had not been purchased for Second Hand Rose but for Ann, and was possibly to be sold through Second Hand Rose only if Ann decided she did not wish to keep it. The record indicates that it had been driven with the plates by Charles and Ann since its purchase in April until the date of the accident in November, excepting the periods when it was off the road for repairs, and there is nothing in the record that indicates this use was to advance Second Hand Rose's interests. Nor did Vernon know of its use or the use of the plates.

On the record before the court, it is evident that Charles did not actively use the vehicle, the plates, the power of attorney, or the booklets to advance the interests of Second Hand Rose or any agreement to secure used automobiles. On this record, therefore, these factors, while ostensibly intended to facilitate Charles's acquisition of vehicles, do not operate so as to create a reasonable inference that Charles was on a roving commission turning every trip of his into an extension of an agreement to help his brother or Second Hand Rose.

In Easterlin v. Green, the court was presented with a clear employment relationship where the employee worked on the dealership grounds during the day and took cars out at night to show friends and acquaintances as prospective purchasers. See

25

150 S.E. 2d at 474. It was customary that the employee sold cars at night. See id. Indeed, this was an important part of the employee's activity on behalf of his employer, see id. at 476-77, and the friends and acquaintances he met were "important to his success as a used car salesman," id. at 477. It was natural for him to combine pleasure and business. See id. Moreover, he had a restricted driver's license that only allowed him to drive his employer's vehicles for business purposes. On the night of the accident in Easterlin the employee had taken the automobile out to "prospect" and see how many sales he could make. See id at 474. The vehicle carried a dealer tag. See id. His activities followed his customary means of carrying on business for his employer.

The second case relied upon by the plaintiffs is Cochran v. Michaels. See 157 S.E. 173 (W.Va. 1931). Cochran is similarly distinguishable as the driver of the dealer's automobile was employed to sell used cars and he only had permission to drive the car for the purpose of potential sales, although he was allowed to transport friends because he gathered information for potential sales through such friends and acquaintances. On the occasion of the accident he was in the process of transporting such acquaintances.

The court finds the plaintiff's reliance on these cases

26

unpersuasive. Significantly, they are not New Hampshire law and they are old cases. Moreover, in this case there is no reasonable basis for concluding that an employment relationship existed. Nor was there a custom of Charles to look for used automobiles for Second Hand Rose given his history of securing such automobiles for the business. Evidence indicates that the only automobile actually transferred to Second Hand Rose by Charles was the Caprice. The record cannot sustain a reasonable inference that Charles harbored intentions of purchasing automobiles on his travels, nor that his travels were incidental to such purchasing. Given his general failure to purchase vehicles for Second Hand Rose, Charles's activities securing automobiles on behalf of Second Hand Rose, or lack there of, could not be considered important to Second Hand Rose, Vernon, or himself.

As discussed above, the plaintiffs also contend the record supports a reasonable inference that on the particular journey during which the accident occurred Charles was showing the car to a prospective purchaser. The plaintiffs base this contention on evidence that: (1) the car in the accident bore dealer plates; (2) no one had title to the car; (3) the car was being driven by someone identified on Vernon's insurance as an owner, employee or relative who operated owned vehicles; and (4) a recent purchaser

27

of an old car of Ann's was a passenger in the vehicle.

Again, on these facts the record cannot support a reasonable inference that Charles held the intention of interesting a prospective purchaser when he embarked on the trip at issue. Instead it indicates that Charles gave the passenger a ride home because he was stranded without another means of returning. Given the history of the use of the dealer plates in this case, the fact that the car had the dealer plates on it does not support a finding to the contrary. Nor, without more, does evidence that the passenger had purchased an old car from Ann, or that the car had an open title, support a finding that Charles embarked on the trip to sell the car to a prospective purchaser. Finally, the court questions the materiality of the insurance policy which identifies Charles as an owner, employee, or relative of the owner of the automobile. Simply because he is listed on Second Hand Rose's policy does not support a reasonable inference that he was acting as its agent during the excursion at issue. In any event, the court has already determined that there is no genuine issue of material fact regarding employee status. The insurance policy therefore might indicate that Charles was an owner of Second Hand Rose or a relative of Vernon. The record indicates Charles's familial relation to Vernon. Even assuming Charles's ownership of Second Hand Rose, this fact would not,

28

under these circumstances, change the nature of the trip at issue.

At first blush the court finds more troubling Charles's statement to his insurer that he was "in the process of taking [the car] back, taking it down to Delaware to to [sic] sell it." Plfs.' Opp., Ex. N at 3. However, the record indicates that the statement, in context, was in response to a broad question. In his deposition Charles clarified the statement as meaning he would take the car to Delaware sometime in early winter if Ann and he decided to sell it. This interpretation is corroborated by the lack of any evidence that he was on his way to Delaware at the time of the accident. Nor do the plaintiffs assert this as a basis for establishing his agency for the trip at issue.

## Conclusion

In counts three through ten the plaintiffs assert the liability of Vernon Malpass, individually; Second Hand Rose; Vernon Malpass, d/b/a/ Second Hand Rose; and Charles Malpass and Vernon Malpass, d/b/a/ Second Hand Rose. All of the claims are predicated upon an agency relationship. See Compl. Counts III, IV (Charles Malpass was agent of Defendant Vernon Malpass and Vernon Malpass through his agents owed plaintiffs a duty of reasonable care); Counts V, VI, (Charles Malpass was agent of

29

Second Hand Rose and Second Hand Rose through its agents owed plaintiffs a duty of reasonable care); Counts VII, VIII (Charles Malpass was agent of Vernon Malpass d/b/a Second Hand Rose and Vernon Malpass d/b/a Second Hand Rose through their agents owed duty to plaintiff); Counts IX and X (Charles Malpass was agent of Vernon Malpass and Charles Malpass d/b/a Second Hand Rose and through their agents they owed duty to plaintiffs). As the plaintiff asserted counts against Vernon Malpass and Second Hand Rose only upon the basis of agency and the court has concluded that no reasonable juror could find that Charles Malpass's trip on the date of the accident was within the scope of said agency, the court grants the defendants' converted motion for summary judgment on counts three through ten (document no. 15).

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

March 19, 1999

cc:  David J. Berg, Esquire
     Donald E. Gardner, Esquire
     Douglas N. Steere, Esquire